PARRO, J.
 

 12Cynthia Bridges, Secretary of the Louisiana Department of Revenue (the Department), appeals a judgment granting partial summary judgment in favor of BP Products North America, Inc.
 
 [1]
 
 (BP Ex & 0) and denying the Department’s cross-motion for partial summary judgment on the issue of whether income from BP Ex <& O’s sale of the Alliance refinery in Belle Chasse, Louisiana, should have been classified as allocable income and taxed solely by the State of Louisiana, or whether, as BP Ex & O contended and the district
 
 *29
 
 court determined, those proceeds were ap-portionable income, taxable proportionally by all states in which BP Ex & 0 does business.
 
 [2]
 
 After reviewing the evidence produced by both parties in this case, we affirm the judgment.
 

 BACKGROUND
 

 BP Ex & 0 was involved in exploration and production of oil and gas; transportation of its products through pipelines; refining crude oil into gasoline, diesel, and other usable consumer products; manufacture of chemicals; development of alternative energy sources; and marketing of its various products through retail sales outlets, such as gasoline stations. BP Ex & 0 was not operated as a stand-alone entity. Rather, BP Ex & O’s exploration and production segment was operated as part of BP’s overall exploration and production business, and its refining segment was operated as part of BP’s overall refining business, etc.
 

 One of the properties owned by BP Ex & 0 was the Alliance refinery in Belle Chasse, Louisiana. As part of the 1998 annual strategic planning performed by BP and all of the global subsidiaries, the decision was made to examine all of the refineries under BP’s umbrella to see which of them best fit the companies’ overall strategic goals. That evaluation process ultimately led to BP Ex & O’s sale of the Alliance refinery in 2000.
 

 In 2004, the Department conducted an audit of the income tax returns filed by |SBP Ex & O for the years 1998, 1999, and 2000. That audit revealed that BP Ex & O had treated the proceeds from the sale of the Alliance refinery as apportionable income, on which taxes would be paid on a proportionate basis to all of the states in which BP Ex & O was doing business. The Department determined that those proceeds should have been designated as allocable income, and because the refinery was situated in Louisiana, all the taxes on the $496,342,655 gain should have been paid to Louisiana.
 
 [3]
 
 BP Ex & O paid the additional taxes due, plus interest, under protest and filed this suit, challenging the Department’s reclassification of the gain from the Alliance refinery sale as allocable income and seeking a refund of the taxes paid under protest. Eventually the parties filed cross-motions for partial summary judgment on this issue. Following a hearing, the court denied the Department’s motion and granted BP Ex
 
 &
 
 O’s motion, concluding that the Alliance refinery sale was made in the regular course of BP Ex & O’s business and its proceeds were, for that reason, apportionable income. This appeal followed.
 

 DISCUSSION
 

 A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant.
 
 Duncan v. U.S.A.A. Ins. Co.,
 
 06-363 (La.11/29/06), 950 So.2d 544, 546;
 
 see
 
 LSA-C.C.P. art. 966. A summary judgment is reviewed on appeal
 
 de novo,
 
 with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate,
 
 ie.,
 
 whether there is any genuine issue of material fact and whether the movant is entitled to judgment as a matter of law.
 
 Samaha v. Rau,
 
 07-1726
 
 *30
 
 (La.2/26/08), 977 So.2d 880, 882-83. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action. LSA-C.C.P. art. 966(A)(2). A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there 14is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
 

 There are no contested issues of material fact in this case. The issue is solely one of law, namely, whether the proceeds from BP Ex
 
 & O’s
 
 sale of the Alliance refinery should be classified for Louisiana corporate income tax purposes as apportionable income or as allocable income.
 

 Under Louisiana corporate income tax law, all items of gross income, not otherwise exempt, are to be segregated by the taxpayer into two general classes designated as allocable income and apportionable income. LSA-R.S. 47:287.92(A);
 
 [4]
 

 see Unocal Pipeline Co. v. Kennedy,
 
 03-1946 and 1947 (La.App. 1st Cir.12/30/04), 898 So.2d 395, 398,
 
 writ denied,
 
 05-0894 (La.6/3/05), 903 So.2d 458. The classification of income determines the method of taxation for such income. Allocable income is allocated for tax purposes directly to the state where the income is earned or derived, while apportionable income is subject to taxation in Louisiana based on an apportionment percentage regardless of where such income is derived.
 
 See
 
 LSA-R.S. 47:287.93 and 47:287.94. Therefore, Louisiana taxes allocable income only if earned in Louisiana, whereas Louisiana taxes a percentage of all apportionable income without regard to its geographic source. Apportionable income is the default category, inasmuch as it includes all items of gross income not properly included in allocable income. LSA-R.S. 47:287.92(0);
 
 Dow Hydrocarbons & Resources v. Kennedy,
 
 96-2471 (La.5/20/97), 694 So.2d 215, 216;
 
 Unocal,
 
 898 So.2d at 399.
 

 Only certain specific classes of gross income described in LSA-R.S. 47:287.92(B) are to be designated as alloca-ble income. At all times relevant to this proceeding, |fiallocable income included:
 

 Profits or losses from sales or exchanges of property, including such items as stocks, bonds, notes, land, machinery, and mineral rights not made in the regular course of business. [Emphasis added.]
 

 LSA-R.S. 47:287.92(B)(2). Additionally, LSA-R.S. 47:287.93(A)(1) stated, in pertinent part, that “profits or losses from sales and exchanges of capital assets consisting of immovable or corporeal movable property shall be allocated to the state where such property is located at the time the income is derived.” Paragraph (A)(3) of LSA-R.S. 47:287.93 clarified that “profits or losses from sales or exchanges not
 
 *31
 
 made in the regular course of business ... shall be allocated to the state where such property is located at the time of the sale.” [Emphasis added.] Louisiana Administrative Code, Title 61, § L1130.A.3 (Regulation 1130)
 
 [5]
 
 provides guidance for the definition of “regular course of business,” stating, in pertinent part:
 

 Whether a sale or exchange is a sale not made in the regular course of business is a factual determination required to be made with respect to each property sold which will take into consideration such factors as the frequency of sales of similar properties and the relationship of the particular sale to other business transacted by the taxpayer.
 

 The Department contends that BP Ex & O’s regular business was exploration for oil and gas, as well as refining and marketing petroleum products; it was not in the business of buying and selling refineries for profit. The Department relies on a regulation promulgated by it, La. Admin. Code, Title 61, § I.1134.D.2 (Regulation 1134), which states that sales of “property acquired for use in the production of income” are not considered sales made in the regular course of business, and further relies on its stated policy of designating as allo-cable all income from sales of any property that was used to produce the products that are sold in the regular course of the taxpayer’s business. Finally, the Department contends that the facts of this case mandate the conclusion that the sale of the Alliance refinery was not in the regular course of BP Ex & O’s business, because it was part of an asset divestiture program and was a onetime sale of the entire business operation, including an agreement with the purchaser |6to retain 90% of BP Ex & O’s employees at the Alliance refinery.
 

 In order for this court to determine whether the sale of the Alliance refinery was or was not made in the regular course of BP Ex
 
 &
 
 O’s business, it is necessary to examine the factual circumstances surrounding BP Ex
 
 &
 
 O’s business and this particular sale, taking into consideration the factors described in Regulation 1130. We note first that the Department admitted that when it decided to reclassify the Alliance refinery sale as one resulting in allocable income, it did not conduct any inquiry or make any factual determination based on the factors in this regulation. Rather, the Department simply applied Regulation 1134, which states that the sale of any property that was acquired and used for the production of the taxpayer’s products would be considered a sale not made in the regular course of business and would be taxed as allocable income, regardless of the facts surrounding such a sale. As applied by the Department, Regulation 1134 ignores the language of LSA-R.S. 47:287.92(B)(2) and 47:287.93, both of which state that only the profits from sales not made in the regular course of business are to be taxed as allocable income. Used in this way, the Department creates a definition in Regulation 1134 that undermines the statutory mandate to consider the regular course of business in determining whether or not a sale results in alloca-ble income. Also, the Department thereby ignores Regulation 1130, which requires that a factual determination be made. An administrative construction cannot be given effect where it is contrary to or inconsistent with the legislative intent of the applicable statute.
 
 Sales Tax Dist. No. 1 v. Express Boat Co., Inc.,
 
 500 So.2d 364, 370 (La.1987);
 
 see also Farmer's Seafood Co., Inc. v. State ex rel. Dept. of Public Safety,
 
 10-1746 (La.App. 1st Cir.2/14/11), 56 So.3d 1263, 1272 (Regulations promul
 
 *32
 
 gated by an agency may not exceed the authorization delegated by the legislature). Therefore, we believe the Department’s reliance on Regulation 1134 is misplaced, and it failed to consider the relevant factors when it reclassified the gains from the Alliance refinery sale as allocable income.
 

 Allen A. Kozinski, who, in the year 2000, was the group vice president for BP’s 17global refinery segment, testified as a fact witness concerning the sale and, in connection with his deposition testimony, also provided an expert report entitled, “Setting a Refining Strategy.” He stated that within the corporation, BP was organized into three main business segments: refining, marketing, and chemicals. In conjunction with its subsidiaries, the company conducted a strategic study each year to come up with a five-year strategic plan. As part of that study, the profitability of the refining segment was evaluated, and it was determined that this area was the most volatile portion of the corporate earnings and that refining was a low return/high capital commodity business. BP considered, and rejected, a spin-off of the entire refining business, and ultimately decided, based on input from its subsidiary companies, to examine the refineries through three “lenses” to see if they met the companies’ long-term strategic goals. BP needed the refineries to provide feed-stocks for its chemical business, to dispose of some unique crude oil that it sometimes acquired, and to supply product for the retail gasoline marketing segment. When the Alliance refinery was examined through these lenses, it did not meet BP’s criteria, and the decision was made to sell it, because it was simply not needed in the system. In a similar fashion, all the assets of the subsidiaries were examined during each annual strategic planning process, to see which properties might be sold in order to maximize profits. Generally, BP expected to generate about $1 billion in income from divestments in any given year, and would re-invest that money within the companies to improve operations for a better return.
 

 The sale of the Alliance refinery was not of fixed assets only, but was the sale of an operating business, including the people, the training, the records, the inventory, the underground piping, the equipment drawings, and the computer programs to run the business. However, neither BP Ex & 0 nor BP went out of the refining business as a result of this sale. Following the 1998 merger with Amoco, BP had sole or joint ownership of twenty-three refineries. It sold five, including the Alliance refinery, in connection with its 2000 strategic plan, bought some additional North American |srefineries when it later acquired ARCO, and also bought the entire German refining capacity of EON in order to expand its European marketing presence. Kozinski stated that the type of regular strategic planning conducted by BP and its subsidiaries was a common and necessary business practice among all the major corporations engaged in petroleum exploration, production, refining, and marketing, enabling them to make major acquisitions and divestments in order to meet their long-term goals. He said that without such strategic planning, “[w]e would be running like the government.”
 

 The evidence included the testimony of Robert James Day, a 27-year BP employee whose duties over that period included virtually all aspects of the business, culminating in the position of president of Eastern Gulf Coast fuels marketing. He confirmed much of Kozinski’s testimony concerning the overall structure of BP, and stated that the company had a “very clear business view that all our assets are under continual review in terms of the nature of what our strategy may be with those assets.” He stated that since the
 
 *33
 
 late '80’s, through its various subsidiaries, BP had acquired whole or part interests in about twenty refineries and since then had sold about nineteen. He said there was a constant process of looking at the changing nature of supply and demand, seeing how different assets within each company’s portfolio stacked up when viewed through whatever lens was being used to make decisions. Day stated that BP had generally acquired refineries through wider acquisitions of other companies. After the Amoco merger, BP decided on three lenses it wanted to use in order to evaluate and maximize the long-term health of the refining portfolio worldwide. The sale of the Alliance refinery was part of the execution of that global strategy, and coincided with an overall company objective to reduce refining exposure. He explained that BP Ex & 0 did not have a separate business strategy from the other companies within the BP umbrella. Day also said that although neither BP Ex & 0 nor any other company in the energy industry looked at its assets as properties to buy, hold for a while, and then sell for a profit, each of the BP companies made constant efforts to provide that it had “the right asset in the right place producing the right products in the Rright manner for the long term.” With reference to the planning that resulted in the sale of the Alliance refinery, he stated that this was not something that happened only as a result of the Amoco acquisition, but was “a standard part of doing business.” The BP group chief executives’ meetings, in which these analyses were reviewed and policy decisions were made, were held every one or two weeks.
 

 The Department did not contest any of the factual information provided by BP Ex & 0. Rather, the Department argued that its established policy was that in order for a sale to be in the “regular course of business,” it had to be a sale of an asset of the type that was usually sold in that taxpayer’s usual line of business. For BP Ex & 0, that might include the sale of chemicals, oil, and gas, but would not include the sale of any asset used to produce any of those products. We reject this analysis. As stated in Regulation 1130, whether a sale is “not made in the regular course of business” is a factual determination to be made by considering such factors as the frequency of sales of similar properties and the relationship of the particular sale to other business transacted by the taxpayer. The evidence in this case shows that BP and its subsidiary companies continually review all of their assets to determine how well each of them fits into the companies’ overall strategic goals. Based on those reviews, decisions concerning acquisitions and divestitures are made and implemented. The sale of the Alliance refinery was not a one-time event; over the years, BP has bought and sold many refineries as part of its overall business. This sale did not take BP Ex & 0 out of the refining business or terminate that segment of its operations; its refining operations continued in other locations and were expanded to meet market needs. The gain from the sale was invested in other aspects of BP’s overall business; it was not distributed to shareholders, as would be the case in a liquidation.
 

 There are no reported Louisiana cases addressing the precise issue before this court in this case. However, in a similar factual situation and applying similar corporate income tax statutes, a Pennsylvania court concluded that the capital gain from the sale of a manufacturing facility was apportionable business income to be paid to all the Instates in which the taxpayer was doing business.
 
 See Welded Tube Co. of America v. Commonwealth,
 
 101 Pa. Cmwlth. 32, 515 A.2d 988 (1986). The
 
 *34
 
 Pennsylvania corporate income tax statutes, like the Louisiana statutes at issue in this case, established a system for the determination of allocation and apportionment of net income of corporations engaged in taxable activities within and without the Commonwealth
 
 Id.
 
 at 992. All income arising from transactions and activities in the regular course of the taxpayer’s trade or business was subject to apportionment, whereas non-business income, defined as “all income other than business income,” was allocated to the situs of the income-producing property.
 
 Id.
 
 at 993. After examining the frequency and regularity of similar transactions in past practices of the business and the subsequent use of the income (the transactional test), as well as whether the acquisition, management, and disposition of the property constituted an integral part of the taxpayer’s regular trade or business (the functional test), the court concluded that under either test, the capital gains from the sale of an entire manufacturing facility by the taxpayer were apportionable income, even though such a sale had only occurred twice in the company’s history. The court stated that “it makes no difference whether income derives from the main business, the occasional business or the subordinate business so long as the income arises in the regular course of business.”
 
 Id.
 
 at 994. The court further declared that “[wjhile the principal business of the taxpayer comprised the manufacture of welded tube, it was a regular practice of this taxpayer to acquire property in the expansion of its business. We conclude that such property constituted an integral part of its business operations and that its disposition generated business income.”
 
 Id.
 
 We find that the analysis set forth by the Pennsylvania court tracks what is required by Regulation 1130, and the decision of that court offers support to the conclusion that BP Ex & O’s sale of the Alliance refinery in this case also generated appor-tionable income.
 

 It is clear from the evidence in this case that the sale of the Alliance refinery was a type of business transaction that was a regular practice of BP Ex & 0 and the BP global | ¶ Refinery segment. Moreover, the sale was directly related to its overall business, since it was designed to streamline the refining operations, so that those operations better served the current needs of all segments of the business and met BP’s strategic goals. Consequently, we conclude, as did the trial court, that the sale of the Alliance refinery was made in the regular course of BP Ex & O’s business. As such, the income from that sale was properly designated as apportionable for corporate income tax purposes.
 

 CONCLUSION
 

 For the above reasons, the judgment of the trial court is hereby affirmed. All costs of this appeal, in the amount of $13,008.50, are assessed to the Department.
 

 AFFIRMED.
 

 [1]
 

 . BP Products North America, Inc. is the successor in interest to BP Exploration & Oil, Inc. It is one of over one hundred companies within the ambit of the parent company, BP, pic (BP), which is headquartered in the United Kingdom and operates globally through these subsidiaries. For the purpose of this opinion, we will not distinguish between BP Products North America, Inc. and BP Exploration & Oil, Inc., and will refer only to BP Ex & O.
 

 [2]
 

 . The judgment was designated as final by the district court on joint motion of the parties, and our review finds no error in that designation under the facts of this case.
 

 [3]
 

 . The Department also reclassified some other items of BP Ex & O's income, such as dividends, interest income, and rental income. The classification of those items is not involved in this appeal.
 

 [4]
 

 . The applicable versions of the relevant tax statutes, comprised of LSA-R.S. 47:287.2 through 287.785, were enacted by 1986 La. Acts, 1st Ex.Sess., No. 16, § 1. A 1992 amendment did not change the substance of these provisions. However, a 1993 amendment significantly revised these statutes. See 1993 La. Acts, No. 690, § 1 (Act 690). In the
 
 Dow
 
 case, 694 So.2d at 216, the Louisiana Supreme Court declared Act 690 unconstitutional, stating:
 

 Because Act 690's reclassification results in an increase in corporate income tax, and because Act 690 was enacted in 1993, we find that Act 690 increases an existing tax in an odd-numbered year in violation of Article III, Section 2(A) of the Louisiana Constitution.
 

 Therefore, the applicable versions of these statutes are as enacted in 1986 and amended in 1992.
 

 [5]
 

 . This opinion refers only to the applicable versions of the relevant regulations.